IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JESSICA A.,

      **Plaintiff,**

  v.                                      Civil Action 3:24-cv-00232
                                                  Judge Thomas M. Rose
                                                  Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Jessica A. brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 8) and **AFFIRM** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed her applications for DIB and SSI in September 2021, alleging that she was disabled beginning January 1, 2017, due to allergies, anxiety, asthma, insomnia, and migraines. (R. at 209–15, 216–22, 278). After her applications were denied initially and on reconsideration, Administrative Law Judge Nicholas J. Schwalbach (the "ALJ") held a telephonic hearing on May 25, 2023. (R. at 39–83). Ultimately, the ALJ denied Plaintiff's applications in a written decision on July 6, 2023. (R. at 15–38). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on August 23, 2024. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 7, 8, 9, 10).

### A. Relevant Hearing Testimony and Statements to the Agency

The ALJ summarized Plaintiff's testimony from the administrative hearing as follows:

> [Plaintiff] alleged disability in part due to back problems. She reported her spinal condition with ongoing pain limits her to standing for fifteen minutes, walking for ten minutes, and sitting for thirty minutes at one time (Exhibit 4E, Hearing Testimony). She also indicated her pain causes her difficulty climbing stairs, using her hands, performing various postural movements, and sleeping (Id.).

(R. at 25–26).

> Additionally, she reported to providers that she loves gardening, hiking, rock climbing, and being outside and is documented taking care of her personal needs, dressing, bathing, and grooming, caring for her pets, preparing at least simple meals, and completing a range of household chores, activities that suggest adequate daily functioning (Exhibits 4E, 4F).

(R. at 28).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records and symptoms related to her mental health issues as follows:

> ***Between at least June 2018 and March 2019, treatment providers including Michael McVey, LPCC, LICDC, and Bonnie Silver, LPC, diagnosed [Plaintiff] with substance- and/or medication-induced bipolar and anxiety disorders, an acute stress disorder, and PTSD (see, for example, Exhibit 1F at 366, 368). In November 2019, Adam Shane, LPC, diagnosed [Plaintiff] with type-II bipolar disorder, obsessive/compulsive disorder, and PTSD with panic attacks (Exhibit 2F at 30). On multiple occasions between at least January 2020 and April 2021, treatment providers including Monica K. Mahajan, M.D., Jennifer Suffridge, N.P., and Wendy Halverson, LPC, diagnosed [Plaintiff] with a moderate manic episode of type-I bipolar disorder, generalized anxiety disorder, and PTSD (see, for example, Exhibits 2F at 38, 3F at 30, 26, 37). In October 2021, David P. Buck, M.D., assessed [Plaintiff] with a depressed episode of type-I bipolar disorder, anxiety, obsessive/compulsive disorder, and borderline personality disorder (Exhibit 5F at 7). Following a consultative psychological evaluation completed in July 2022 at the request of the Division of Disability Determination (DDD), Robert J. Kurzhals,

Ph.D., diagnosed [Plaintiff] with bipolar disorder, an anxiety disorder, and, provisionally, with a personality disorder (Exhibit 6F at 5). On multiple occasions between at least October 2022 and May 2023, treatment providers including Dinah Callender, PMHNP, and Laura Little, LSW, diagnosed [Plaintiff] with a severe depressed episode of type-I bipolar disorder and PTSD (see, for example, Exhibits 7F at 48, 12F at 10).

[Plaintiff] used methamphetamine, cocaine, marijuana, and opiates regularly and sought minimal to no treatment for her mental health from her alleged onset date to November 2019 (Exhibits 1F, 2F, 7F). However, [Plaintiff] evidenced generally good overall functioning during treatment examinations despite her mental health conditions and history of substance abuse. Once starting medication and no longer abusing substances, [Plaintiff] consistently evidenced normal findings, such as normal speech, thought process, associations, judgment, insight, orientation, memory, attention/concentration, fund of knowledge, and affect during examinations from January through July 2020 (Exhibit 2F at 45-46, 63). [Plaintiff] continued to demonstrate normal findings at evaluations outside of an anxious mood and made gains with treatment through April 2021, when mental health services were terminated because she stopped coming for treatment (Exhibits 2F, 3F). [Plaintiff] indicated she was thrown off by a move to the suburbs, stopped taking lithium because of side effects, and then stopped going to groups (Exhibit 3F). [Plaintiff] attended one treatment in October 2021, where she reported mild anxiety and depression, with normal mental status examination findings (Exhibit 10F). [Plaintiff] subsequently had a large gap in treatment.

She was next seen at a consultative examination in July 2022 with Dr. Kurzhals. She reported taking no medications at the time of the examination and denied a history of hospitalization for her mental health (Exhibit 6F). However, despite the lack of treatment and medication for her conditions, she appeared adequately groomed, friendly and cooperative with the ability to understand and follow simple instructions (but some had to be repeated), low average to average intellect, full orientation, the ability to recall two out of three items after delay, identify similarities between words, and correctly solve most simple calculations despite appearing restless and fidgety with rapid and pressured speech, some deficits performing serial seven subtractions, below average concentration, and depression (Exhibit 6F).

In October 2022, [Plaintiff] restarted treatment and was placed on Wellbutrin, Lamictal, and Trazodone (Exhibit 7F). On examination that month, she appeared well-groomed and cooperative with normal eye contact, speech, thought content, and thought process, as well as euthymic mood, full affect, good insight, good judgment, and average intellect (Exhibit 11F at 13-14). She continued to evidence normal findings in December 2022 (Exhibit 11F at 31-32).

Subsequent examinations continued to show [Plaintiff] demonstrating mostly normal findings, as she was oriented times four with appropriate rapport,

appearance, and grooming, coherent and appropriate speech, good insight and judgment, normal psychomotor activity, and good memory despite some mood, affect, and thought content/process deficits in the setting of minimal medication compliance (Exhibit 12F at 4-5, 16, 26-27, 38, 48-49, 59-60, 70-71, 81-82). ***

(R. at 26–27).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through September 30, 2017. (R. at 21). She has not engaged in substantial gainful activity since January 1, 2017, the alleged onset date. (*Id.*). The ALJ also determined that Plaintiff has severe impairments: degenerative disc disease with status/post fusion, bipolar disorder, anxiety and/or obsessive-compulsive disorder, personality disorder, post-traumatic stress disorder, and a history of substance abuse. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (*Id.*).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the following exceptions: No more than frequent climbing of ramps and stairs. No more than occasional stooping, kneeling, crouching, or crawling. No climbing of ladders, ropes, or scaffolds. [Plaintiff] should avoid concentrated exposure to extreme cold, and all exposure hazards such as moving machinery and unprotected heights. [Plaintiff] can understand, remember, and carry out simple instructions, perform routine tasks, and use judgment to make simple, work-related decisions. [Plaintiff] can perform goal-oriented work, such as an office cleaner, but is unable to perform at a production-rate pace, as would be required for assembly line work. No more than occasional and superficial contact, as defined[], with supervisors and co-workers; no contact with the general public as part of job duties. No teamwork or tandem tasks. [Plaintiff] can tolerate occasional changes in an otherwise routine work setting, explained in advance to allow time for adjustment to new expectations. No access to drugs or alcohol.

(R. at 24).

The ALJ determined that Plaintiff is unable to perform her past relevant work as a delivery

driver, order picker, nurse aide, or child monitor. (R. at 31). The ALJ relied on testimony from a Vocational Expert ("VE") to determine that given Plaintiff's age, education, work experience and RFC, she was able to perform work that existed in significant numbers in the national economy, such as a merchandise marker, routing clerk, or a mail clerk. (R. at 32–33). Consequently, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since January 1, 2017. (R. at 33).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff argues that the ALJ reversibly erred in his evaluation of the prior administrative medical findings of the state agency reviewing psychologists, Aracelis Rivera, Psy.D., and Audrey Todd, Ph.D. (Doc. 8 at 5–8; *see also* Doc. 10). The Commissioner counters that the ALJ's RFC determination fairly accommodates these limitations. (Doc. 9 at 3–6).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [her] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). When determining the RFC, the ALJ must evaluate several factors, including medical evidence, medical opinions, and the plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). In doing so, the ALJ must resolve conflicts in the record. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). To that end, an ALJ "is only required to include in the residual functional capacity those limitations he finds credible and supported by the record." *Beckham v. Comm'r of Soc. Sec.*, No. 1:19-cv-576, 2020 WL 5035451, at *7 (S.D. Ohio Aug. 26, 2020) (quoting *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020)). And an ALJ is not required to adopt a medical opinion verbatim. *See, e.g.*, *Poe*, 342 F. App'x at 157 ("Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."); *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."); *Cooper v. Comm'r of Soc. Sec.*, No. 2:18-CV-67, 2018 WL 6287996, at *5 (S.D. Ohio Dec. 3, 2018), *report and recommendation adopted*, No. 2:18-CV-67, 2019 WL 95496 (S.D. Ohio Jan. 3, 2019) ("Certainly, an ALJ is not required to mirror or parrot medical opinions verbatim."). The court must affirm if substantial evidence supports the ALJ's decision, even if the court would have resolved conflicts in the record differently. *See Christine G. v. Comm'r of Soc. Sec.*, No. 2:22-cv-1969, 2023 WL 5717417, at *6 (S.D. Ohio Sept. 5, 2023).

The ALJ summarized the assessments of Aracelis Rivera, Psy.D., and Audrey Todd, Ph.D. as follows:

> [Aracelis Rivera, Psy.D., and Audrey Todd, Ph.D.] opined that [Plaintiff] is capable of understanding and carrying out relatively simple tasks, but should not be subject to strict production or pacing requirements, more than superficial social interactions, or an unpredictable work setting with more than infrequent routine changes.

(R. at 29).

In evaluating Drs. Rivera and Todd's opinions, the ALJ found their conclusions as to Plaintiff's mental function partially persuasive, determining:

> The [ALJ] finds these recommended levels of limitation supported by citations to the record and reasonably consistent with the medical record, which shows generally good mental status examination findings and response to treatment, especially when compliant with medication and no more than moderate deficits on examination when minimally compliant. Their assertions are also not inconsistent with Dr. Kurzhals' report, who examined [Plaintiff] when she took no medication and received no treatment for her mental health, and has substantively adopted Dr. Rivera's and Dr. Todd's assessed limitations as [Plaintiff]'s residual mental functional capacity. Yet, not all of these recommendations are expressed in vocationally defined terms, however, such as the use of the term "superficial" to describe the quality of social interactions. The undersigned has therefore adapted the noted recommendations in the vocationally defined terms above, and in the case of the term superficial, provided a specific and vocationally relevant definition for the term, in order to comply with regulatory requirements without being inconsistent with the supportable and consistent portions of either Dr. Rivera's or Dr. Todd's opinions. The undersigned notes, however, that the recommendation of a restriction to single-step tasks is unsupported by the record, which consistently shows [Plaintiff] having normal concentration and intact knowledge both prior to and following the consultative examination (Exhibits 3F at 1, 10, 19, 29, 4F at 23, 7F-16, 10F-6, 18). While [Plaintiff] notes [Plaintiff] also has had some concentration deficits on examinations following the consultative examination (such as 7F-44), the overall objective record, her treatment history, including gaps in treatment, her good response to medication, and her documented daily activities, do not support intellect or concentration deficits so severe as to limit her to one step instructions. The undersigned also does not adopt the need for an isolated work environment, especially in light of [Plaintiff]'s ability to maintain a long-term significant live-in relationship and the fact that she is consistently shown being cooperative during examinations (Exhibits 4F at 23, 7F at 16, 39, 10F at 7, 19). Instead, the undersigned imposes related, but less restrictive, limitations in these areas.

7

(R. at 29.)

Plaintiff's challenge to the ALJ's analysis of the state agency psychologists' opinions, and the related limitations incorporated in the RFC, is two-fold.

### A. Static Job Duties

First, Plaintiff argues that even though the ALJ purported to adopt the limitations opined by Drs. Rivera and Todd related to work setting and routine changes, in actuality, he did not. (Doc. 8 at 7). She argues the ALJ's conclusion that she can "tolerate occasional changes in an otherwise routine work setting" is inconsistent with the doctors' opinion that Plaintiff retains the capacity to "perform routine tasks in a setting where job duties are static and she has additional time to adjust to changes in expectations." (*Id.* (citing R. at 24, 116)). And, says Plaintiff, this discrepancy, without an explanation, represents reversible error. (*Id.*).

At the outset, the Undersigned reiterates that an ALJ is not required to recite medical opinions verbatim. *Poe*, 342 F. App'x at 157. Still, an ALJ "must meaningfully explain why certain limitations are not included in the RFC determination—especially when such limitations are set forth in opinions the ALJ weighs favorably." *Howard v. Comm'r of Soc. Sec.*, No. 3:14-CV-364, 2015 WL 8213614, at *4 (S.D. Ohio Dec. 9, 2015), *report and recommendation adopted*, No. 3:14-CV-364, 2016 WL 99114 (S.D. Ohio Jan. 7, 2016). And an ALJ must provide an explanation that allows the Court to conduct a meaningful review of the decision. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Here, the ALJ sufficiently accounted for the doctors' opined limitations related to Plaintiff's job duties and work setting. Their opinion stated that Plaintiff retained "the capacity to perform routine tasks in a setting where job duties are static and she has additional time to adjust to changes in expectations." (*See* R. at 92, 105, 116, 127). In the RFC, the ALJ included at least

8

two related limitations: that Plaintiff could perform "routine tasks" and that Plaintiff could tolerate "occasional changes in an otherwise routine work setting, explained in advance to allow time for adjustment to new expectations." (R. at 24). Notably in the RFC, "occasional changes" qualifies the work setting—not job duties or tasks. (*Id.*). This is important because Drs. Rivera and Todd opined that Plaintiff's job duties, not work setting, should be static. (*See* R. at 92, 105, 116, 127). But either way, the doctors did not foreclose that changes generally could occur. They expressly contemplated some changes in expectations were permissible if Plaintiff was allowed time to adjust—a limitation the ALJ incorporated in the RFC. (*Id.*).

This Court has found such language sufficiency accommodates similar opined limitations. *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, No. 2:20-CV-5473, 2021 WL 3883061, at *7 (S.D. Ohio Aug. 31, 2021) ("The limitation of a 'static task setting' is accommodated by requiring that Plaintiff '[e]ngage in predictable work activity, defined as that with only occasional changes in the work setting or general nature of the tasks performed[.]'"), *report and recommendation adopted*, No. 2:20-CV-5473, 2021 WL 5299839 (S.D. Ohio Nov. 15, 2021); *Harris v. Comm'r of Soc. Sec.*, No. 2:18-CV-288, 2018 WL 6321242, at *7 (S.D. Ohio Dec. 4, 2018) (finding restrictions that the plaintiff could tolerate only "occasional changes" and "work duties that are explained" sufficiently accommodated an opinion that the plaintiff retained "the ability to perform routine job duties that remain static and are performed in a very structured, stable, predictable work setting [that] doesn't undergo frequent changes"), *report and recommendation adopted*, No. 2:18-CV-288, 2019 WL 430500 (S.D. Ohio Feb. 4, 2019). And courts have suggested that a routine work setting, like the one opined by Drs. Rivera and Todd, can inherently allow for occasional changes. *Cf., e.g.*, *Scotty K. v. O'Malley*, No. 1:23-CV-00127-LLK, 2024 WL 1055107, at *3 (W.D. Ky. Mar. 11, 2024) (concluding an ALJ implicitly found a plaintiff could tolerate occasional workplace changes when

9

he included a restriction to "simple, routine task and instructions in a routine work setting" in the RFC) ("A routine work setting would be limited to occasional workplace changes.").

What's more, even crediting Plaintiff's position, the ALJ was only "partially persuaded" by the state agency psychologists' opinion. (R. at 29). Plaintiff is correct that the ALJ "substantively" adopted many of the doctors' opined limitations, but there were caveats. Relevant here, the ALJ explained that some of the opined limitations were not expressed in "vocationally defined terms," and he adjusted the RFC to include vocationally defined language. (*Id.*). Plaintiff does not argue, nor is it the case, that "static" is vocationally defined. *See Neal B. v. Comm'r of Soc. Sec. Admin.*, No. 3:23-CV-75, 2024 WL 963713, at *4 (S.D. Ohio Mar. 5, 2024) (citing VE testimony that "static" or "generally static work environment" are not vocationally defined). Whereas "occasionally" is. *See* SSR 83-10 ("'Occasionally' means occurring from very little up to one-third of the time.").

In the end, the ALJ did not word-for-word copy the opinions. But as previously stated, he was not required to do so. *See, e.g.*, *Poe*, 342 F. App'x at 157; *Reeves*, 618 F. App'x at 275; *Cooper*, 2018 WL 6287996, at *5. Ultimately, it is the ALJ's role, not a physician's, to craft a claimant's RFC. *Borgan v. Comm'r of Soc. Sec.*, No. 2:20-CV-6166, 2022 WL 109346, at *6 (S.D. Ohio Jan. 12, 2022), *report and recommendation adopted sub nom. Timothy Alan B. v. Comm'r of Soc. Sec.*, No. 2:20-CV-6166, 2022 WL 2612101 (S.D. Ohio Jan. 27, 2022). Because the ALJ found the state agency psychologists' opinions only partially persuasive and accounted for the opined limitations he found persuasive, he was under no obligation to do more. The Undersigned can adequately trace his reasoning, enabling proper review. *Davis v. Comm'r of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019) (citation omitted) ("Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his

10

conclusion.'), *report and recommendation adopted sub nom. Davis v. Comm'r of Soc. Sec.*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020).

### B. Changes Explained in Advance

Plaintiff next argues that her need for occasional changes "explained in advance to allow time for adjustment to new expectations" is work preclusive. (Doc. 8 at 9 (citing R. at 24)). For support, she looks to the VE's testimony. (*Id.*). The Commissioner argues that Plaintiff misconstrues the VE's testimony. (Doc. 9 at 4). The Undersigned finds that the Commissioner reads the record better.

At the disability hearing, the ALJ posed a hypothetical, asking if a person with the same age, education, and work history as Plaintiff could perform work with certain restrictions. (R. at 77–78). The ALJ's hypothetical included that the person could "tolerate occasional changes in an otherwise routine work setting explained in advance to allow time for adjustment to new expectations." (*Id.*). The VE answered affirmatively and provided three representative examples consistent with the hypothetical. (*Id.*; *see also id.* at 79 (noting the answer did not change if work was performed at a sedentary level)).

> On cross-examination, Plaintiff's attorney and the VE had the following exchange:
>
> Q: If somebody needs additional time to adjust to changes in expectation, so I would say they're working at a slower pace maybe than other employees at times, maybe completing less work over the course of a week . . . while adjusting to changes. . . . Could you say what kind of effect that would have?
>
> A: Would this individual need extra supervision during the time of changes to work expectations?
>
> Q: Let's say both ways, yes, they do need additional supervision or no, they don't . . . would that make a difference in what the impact would be?
>
> A: So, I believe I can comment on the time to adjust a standalone issue. Regardless of if the person needed extra supervision or not, if they are not meeting daily quotas, if they are not being – meeting production standards and if they did need extra

11

>supervision, that would not be consistent with a competitive work environment, in my opinion.
>
>Q: And would you say even if they did not have a specific quota, you know, or a production requirement that they were still just overall completing less work, would the effect be the same?
>
>A: If they are not keeping up with other workers completing the same work in completing more work, then I would say yes, that would – that's not consistent with a competitive work environment.

(R. at 81–82).

Importantly, on cross-examination, Plaintiff's attorney further qualified the ALJ's hypothetical by including in the "time to adjust" limitation an assumption that the individual would also work at a slower rate than other workers. (R. at 82). While Plaintiff points to the VE's comment that "I believe I can comment on the time to adjust as a standalone issue" as indicative that what came next applied to the time to adjust restriction, (Doc. 10 at 2), the Undersigned does not agree. No matter the framing, in answering the question, the VE substantively addressed only the portion of counsel's question related to completing work. (*Id.* ("If they are not keeping up with other workers completing the same work in completing more work . . . that's not consistent with a competitive work environment.")).

What's more, in opining that Plaintiff needs "additional time to adjust to changes in expectations," Drs. Rivera and Todd did not concurrently opine that Plaintiff would need to be allowed to work at a slower rate compared to other workers either before or after those changes were implemented. (*See* R. at 92, 105, 116, 127; *see also* R. at 995–96 (noting Dr. Kurhal's evaluation "suggests" a limitation in Plaintiff's ability to deal with normal pressures in a competitive work environment and her ability to understand, carry out, and remember instructions, but not opining that she required a limitation allowing her to work at a slower pace than other workers)). In short, it is not inherent to this limitation that Plaintiff would work at a slower rate.

The restriction the ALJ ultimately included in the RFC is consistent with the VE's testimony. (*Compare* R. at 24 *with* R. at 78). Consequently, Plaintiff's assignment of error arguing otherwise is not well-taken.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **DENY** Plaintiff's Statement of Errors (Doc. 8) and **AFFIRM** the Commissioner's decision.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: February 11, 2025           /s/ Kimberly A. Jolson
                                  KIMBERLY A. JOLSON
                                  UNITED STATES MAGISTRATE JUDGE